IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Rajumati Kanaiyalal Shah, | No. CV-09-0046-PHX-GMS |
| Petitioner, | **ORDER** |
| vs. | |
| Secretary, Department of Health and Human Services, | |
| Respondent. | |

Pending before the Court is the appeal of Petitioner Rajumati Shah ("Ms. Shah"), which challenges the decision of the Department of Health and Human Services denying reimbursement of health-related expenses that Ms. Shah incurred while visiting India. For the reasons set forth below, the Court affirms that decision

**BACKGROUND**

Ms. Shah is a seventy-seven year old Medicare beneficiary who receives healthcare benefits through a program known as "Medicare Advantage." (R. at 258.) Under the "Medicare Advantage" program, eligible individuals, such as Ms. Shah, can elect to receive Medicare benefits by enrolling in a privately-managed care plan whereby the beneficiary agrees to use pre-selected service providers. 42 U.S.C. § 1395w-22(d)(1). Additionally, an enrollee in a Medicare Advantage program may only obtain reimbursement for out-of-network services under limited circumstances. *Id.* at § 1395w-22(d)(1)(C)–(E). An enrollee, however, is entitled to reimbursement for out-of-network expenses under the following

1 exceptions: (1) where "the services were medically necessary and immediately required" but
2 "it was not reasonable given the circumstances to obtain the services through the
3 organization;" and (2) where services are needed to evaluate or stabilize an "emergency"
4 medical condition. *See id.*

In January 2007, Ms. Shah was enrolled in a Medicare Advantage program administered by Health Net of Arizona ("Health Net") when she traveled with her husband to India to visit family. According to her agreement with Health Net, Ms. Shah was entitled to reimbursement for out-of-network services under the following circumstances:

> If you need care when you are outside the service area, your coverage is limited. The only services we cover when you are outside your service area are care for a medical emergency, urgently needed care, renal dialysis, and care that Health Net of Arizona or a plan provider has approved in advance.

(R. at 258.) And, as explained in further detail in the Discussion Section of this Order, the agreement further provides definitions of "medical emergency" and "urgently needed care" that closely track the statutory language found in § 1395w-22(d)(1)(C)–(E). (*See* R. at 257, 260).

Upon arrival in India, on January 11, 2007, Ms. Shah's left knee "locked up," and she began experiencing severe pain. (R. at 38.) As a result of the pain and inability to move her knee, Ms. Shah visited an out-of-network physician by the name of Bharat S. Mody ("Dr. Mody"), who recommended knee replacement surgery. (R. at 12, 38.) Due to Ms. Shah's history of diabetes, high cholesterol, high blood pressure, anxiety, and aortic valve disorder, however, Dr. Mody indicated that he could not perform the procedure until he reviewed Ms. Shah's medical records. (*Id.*) These records, which were located in the United States, arrived in India more than a week later on January 19, 2007. (*Id.*) In the interim, Dr. Mody prescribed pain killers to help alleviate Ms. Shah's discomfort. (*Id.*) On January 21, after Dr. Mody reviewed her medical history, Ms. Shah was admitted to the Center for Knee Surgery in India. The following day, she underwent a total knee replacement. (*Id.*) Upon discharge from the Center on January 27, 2007, Ms. Shah checked into a nearby hospital where she

remained for two months while she received physiotherapy. (*Id.*) The total cost of her treatment was $6,801.01. (R. at 137, 152.)

In April of 2007, Ms. Shah filed a claim with Health Net, seeking reimbursement for the expenses related to her knee replacement. (R. at 115, 130–34.) Health Net, however, denied the claim in its entirely on the ground that the "[p]rovider [was] not within [her] assigned network of providers and the service [was] not considered emergent." (R. at 125–27.) After Ms. Shah sought reconsideration, Health Net referred the matter to an independent review body, Maximus Federal Services, Inc. ("Maximus") for further review. (R. at 139–40.) Maximus determined that Ms. Shah's visit with Dr. Mody on January 12, 2007 met Medicare guidelines for urgently needed care, but found that the remainder of the services did not meet the guidelines for emergency or urgently needed services. (R. at 63.)

Ms. Shah next sought review by an administrative law judge, and a hearing was held before Administrative Law Judge Richard J. Zettel (the "ALJ") on May 15, 2008. (R. at 375–405.) During the hearing, Ms. Shah presented a letter from Dr. Mody explaining that the knee surgery was appropriate because "the alternative of moving [Ms. Shah] to [the] USA with a locked knee, considering her age . . . anxiety, poor physical stamina, and the considerable strain involved in a long air journey in economy class, was not feasible." (R. at 54.) Ms. Shah also presented testimony at the hearing in which she explained that she could not have tolerated a flight back to the United States for treatment from an in-network provider because she was experiencing excruciating pain. (R. at 38.) Ms. Shah's husband then added that his wife was in extreme pain and that they decided to go forward with the procedure based on the advice of the Indian doctors. (R. at 391–96.) He also testified that he attempted to obtain preauthorization for the surgery from Health Net, but that he was unable to do so due to time zone and telephone difficulties. (R. at 396–97.)

After Ms. Shah presented her case, a representative from Health Net, Renne DeStafano, testified. (R. at 397–98.) According to Ms. DeStefano, Ms. Shah could not have endured a ten-day wait if the situation had truly been urgent or an emergency. (*Id.*) The final witness to testify at the hearing was Debra Brown ("Dr. Brown"), an expert retained by

Health Net. (R. at 398–401.) Dr. Brown testified that, given Ms. Shah's initial diagnosis of osteoarthritis, a total knee replacement was not urgently required or emergent:

> If a patient does present with pain and a locked knee, there are other conservative therapies that can be performed prior to a total knee [replacement]. That is not a community standard for an emergency procedure, especially given the limited amount of clinical information that we have. There's other things, such as physical therapy, even a knee arthroscopy, to look for a cause for a locked knee, performed prior to a total knee procedure.

(R. at 399–400.) Dr. Brown also testified that "if this was truly an emergency," Ms. Shah should "have been evaluated on an emergency basis, gotten cardiac clearance and a surgical intervention" immediately rather than waiting for ten days. (R. at 400–01.)

The ALJ rejected Ms. Shah's claim in a July 7, 2008 decision. (R. at 11–21.) The ALJ concluded that "Dr. Brown's testimony satisfactorily established that if the beneficiary's condition constituted a true 'emergency,' Dr. Mody [could not have] . . . wait[ed] ten days for records . . . before he performed the total knee replacement." (R. at 20.) The ALJ then added, "While [Ms. Shah's] husband provided emotional testimony regarding [her] situation, it was non-emergent, and Health Net's procedures for elective surgery should have been followed." (R. at 21.) Following Ms. Shah's timely appeal, the Medicare Appeals Council ("MAC") affirmed the ALJ's decision, holding that "the medical evidence does not support [Ms. Shah's] contentions that her knee surgery was either emergent or urgently needed." (R. at 6.) Ms. Shah, appearing *pro se*, then filed the instant appeal.(Dkt. # 1.)

## JURISDICTION & STANDARD OF REVIEW

A party to a final decision made by the MAC may seek judicial review if the amount in controversy is $1,000 or more. 42 U.S.C. § 1395w-22(g)(5); *see Heckler v. Ringer*, 466 U.S. 602, 607 (1984) ("If the Appeals Council also denies the claim and if the claim exceeds $1,000, only then may the claimant seek judicial review in federal district court of the 'Secretary's final decision.'") (citation omitted). When, as is the case here (R. at 6), the MAC explicitly "adopt[s] the decision of the ALJ, that decision stands as the final decision" for this Court's review. *See Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001); *see also Erickson v. Shalala*, 9 F.3d 813, 816 (9th Cir. 1993).

When conducting its review, the Court considers the administrative record in its entirety, "weighing both evidence that supports and evidence that detracts from the Secretary's conclusion." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir.1999) (citation omitted). A final decision will be disturbed only if the factual findings underlying the decision are not supported by substantial evidence or if the decision fails to apply the correct legal standards. *Id.* at 1097; *see also* 42 U.S.C. § 1395ff(b)(1)(A) (incorporating 42 U.S.C. 405(g) by reference). "If the evidence is susceptible to more than one rational interpretation," the Court may not substitute its judgment for that of the agency. *Bear Lake Watch, Inc. v. FERC*, 324 F.3d 1071, 1086 (9th Cir. 2003). Substantial evidence is "more than a mere scintilla but less than a preponderance." *Tackett*, 180 F.3d at 1098 (citation omitted). It is "evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

## DISCUSSION

The issue before the Court is whether the ALJ and MAC erred when they concluded that Health Net of Arizona is not required to reimburse Ms. Shah's out-of-network total knee replacement, impatient hospital stay, and associated expenses related to her surgery. This question turns on whether there is substantial evidence supporting the ALJ's conclusion that Ms. Shah's knee surgery was neither emergent nor urgently needed. Though the Court sympathizes with Ms. Shah's situation, the Court concludes that the ALJ's determination is supported by substantial evidence.

First, there is substantial evidence that Ms. Shah's knee replacement surgery was not a "medical emergency." Under the statute authorizing Medicare Advantage programs, "an emergency medical condition" is defined as

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in–(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part.

1  42 U.S.C. § 1395w-22(d)(3)(B). Similarly, Health Net's coverage agreement defines
2  "medical emergency" as "when you reasonably believe your health is in serious danger when
3  every second counts. A medical emergency includes severe pain, a bad injury, a serious
4  illness, or a medical condition that is quickly getting much worse." (R. at 257.) Here, the ALJ
5  based his determination that Ms. Shah's condition was not a medical emergency on the fact
6  that the doctors in India waited ten days after Ms. Shah's initial consultation to perform the
7  knee replacement surgery. (R. at 20.) Dr. Brown further testified that the delay undermined
8  any claim of an emergency, and the ALJ credited this opinion. (*Id.*) And though Ms. Shah
9  *believed* that she required emergency medical services, her *subjective* belief is insufficient
10 to require Health Net to reimburse her medical expenses as both the statutory definition of
11 an emergency medical condition and Health Net's definition indicate that the individual's
12 belief must be *reasonable*. *See* 42 U.S.C. § 1395w-22(d)(3)(B). (R. at 257.) Given the ten-
13 day delay, the ALJ had substantial evidence on which to find that Ms. Shah's circumstances
14 did not constitute a medical emergency. (R at 20.)

15 There is also substantial evidence that the total knee replacement was not urgently
16 needed. Under § 1395w-22(d), urgently needed care is defined as

> services were not emergency services . . . , but (I) the services were medically necessary and immediately required because of an unforeseen illness, injury, or condition, and (II) it was not reasonable given the circumstances to obtain the services through the organization[.]

20 § 1395w-22(d)(1)(C)(i). Likewise, Health Net's coverage agreement defines such care as
21 "when you need medical attention right away for an unforseen illness or injury, and it is not
22 reasonable given the situation for you to get medical care from you [primary care physician]
23 or other plan providers. In these cases, your health is *not* in serious danger." (R. at 260.)
24 Here, the ALJ was presented with conflicting evidence concerning whether it was *reasonable*
25 for Ms. Shah to undergo a total knee replacement before returning to the United States. While
26 her treating physician, Dr. Mody, offered evidence that it was not "feasible" for Ms. Shah
27 to return to the United States (R. at 54), Dr. Brown testified that a total knee replacement is

a drastic, last-step option and that performing such surgery before pursuing other treatment options deviates from the standard of care (R. at 399–401).

The ALJ was persuaded by Dr. Brown's opinions, finding that the ten-day delay corroborated Dr. Brown's determination that a total knee replacement was not medically necessary and immediately required. (R. at 20.) Additionally, given that there was no evidence that Dr. Mody considered any alternative treatment options, the ALJ relied on Dr. Brown's undisputed testimony that much less drastic treatment could have been done for Ms. Shah to enable her to return to the United States for evaluation by an in-network provider. (*Id.*) Accordingly, the ALJ's decision is supported by substantial evidence from the administrative record. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) ("When confronted with conflicting medical opinions, an ALJ need not accept a treating physician's opinion that is conclusory and brief and unsupported by clinical findings.") (citation omitted); *see also Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600–01 (9th Cir. 1999) ("Opinions of a nonexamining, testifying medical advisor may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it. . . . The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.") (citations and quotation omitted).

**IT IS THEREFORE ORDERED** that the decision of the Medicare Appeals Council is **AFFIRMED**. The Clerk of the Court is directed to **TERMINATE** this action.

DATED this 12th day of April, 2010.

G. Murray Snow
United States District Judge